Earl Worthy III #368520
CCA/FCC POB 6200
Florence, AZ. 85232

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

RECEIVED

SEP 0 1 2006

CLERK, U.S. DISTRICT COURT
ANCHORAGE, ALASKA

| | |
|---|---|
| EARL WORTHY III, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | |
| ) | |
| MARC ANTRIM, et al., ) | |
| ) | |
| Defendants. ) | CASE NO.: 3:05-CV-0248 (TMB) |
| ) | |

**OPPOSITION TO DEFENDANT"S MOTION FOR**
**SUMMARY JUDGMENT**

COMES NOW THE Plaintiff, Earl Worthy III, pro se, and respectfully opposes defendant's Motion for Summary Judgment.

Plaintiff incorporates §I Procedural Posture of defendant's Motion for Summary Judgment(hereafter MSJ)by reference herein.

This opposition is supported by Memorandum of Law and Fact and attached Affidavit of Plaintiff.

1

## SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if the record before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Celotex Corp. v. Catrett, 106 S.Ct. 2548(1986).

Because credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are jury functions, not those of a judge the evidence of the non-movant is to be believed and all reasonable inferences are to be drawn in his favor. Anderson v. Liberty Lobby Inc., 106 S.Ct. 2505 (1986), Warren v. City of Carlsbad, 58 F.3d 439, 441(9th.Cir. 1995).

## MEMORANDUM OF LAW AND FACT

I. Introduction and Factual Background.

Having had a spiritual awakening and desiring to return to his faith the plaintiff approached defendant Chaplain Aguirre (hereafter Aguirre)to request access to kosher meals and permission to purchase prayer oils and other religious items.

2

The plaintiff was informed that it was his burden to prove or otherwise verify that he was in fact Jewish. CCA Policy 20-102(Exhibit A). Attempting reasonable compliance the plaintiff provided a writing declaring his religious beliefs. Request for Service dated 03.14.05(Exhibit B). The plaintiff also permitted Aguirre to speak with his Uncle Robert Akrish in order provide verification that he was in fact Jewish.

At the conclusion of these events the plaintiff was informed that he had not satisfied Policy 20-102(ii) and that his request would be denied pending compliance with that policy. The plaintiff on 04.06.05 filed an administrative grievance which was screened back. The plaintiff appealed that finding on 04.13.05. That appeal was denied and this action followed.

The defendants have not disputed that plaintiff's access to a religious diet, prayer oils, etc., was contingent upon his compliance with the policy requiring him to obtain verification of his membership in the Jewish faith from an outside religious organization. The plaintiff requested in writing a religious diet and access to materials on religious grounds. All of these facts are in the plaintiff's personal knowledge.

3

II. Argument and Law.

A. Religion in Prisons.

Incarceration necessarily requires restrictions on some rights, but there is no "iron curtain drawn between the Constitution and the prisons of this country." Wolff v. McDonnell, 94 S.Ct. 2963(1974). Federal courts have long recognized that prisoners may bring constitutional claims, including those based on the First Amendment right to free exercise of religion. Bell v. Wolfish, 99 S.Ct. 1861(1979), Cruz v. Beto, 92 S.Ct. 1079 (1972). This concern for religion stems in part from a belief in religion's redemptive powers. O'Lone v. Shabazz, 107 S.Ct. 2400(1987). But it also stems from the conviction that the right to observe one's faith is one of the most important rights of every person.

Nevertheless, prisoners do not have untrammeled rights under the Free Exercise Clause. The Supreme Court has cautioned that managing a prison is a difficult undertaking that requires elements that are peculiarly within the province of the government. Turner v. Safley, 107 S.Ct. 2254(1987). Courts construing the Free Exercise Clause have traditionally deferred to the expertise of prison administrators. Procunier v. Martinez, 94 S.Ct. 1800(1974)

4

In  Turner  the Supreme Court articulated a minimal scrutiny test for evaluating prisoner's constitutional claims. The court held that when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interest. Turner, 107 S.Ct. at 2261. Turner also considered other factors, including the existence of alternative means for inmates to exercise their constitutional rights; the impact that accommodation would have on guards, inmates, and prison resources; and whether alternatives to the prison regulation are available at a "de minimus cost." Id at 2262.

In  O'Lone,  the  Court  explicitly applied Turner to a case involving a prisoner's free exercise rights. O'Lone involved prison work policies that prevented Muslim prisoners from attending Islamic Jumu'ah services. O'Lone, 107 S.Ct. at 2403. Applying Turner, the Court upheld the restriction. It concluded that there was a valid connection between the regulation and the prison's interest in safety and rehabilitation. Id at 2405. It also found that Muslim prisoners could express their faith in alternative ways. Id at 2406. The regulations therefore withstood Turner's minimal scrutiny.

5

The standard for evaluating free exercise claims brought by nonprisoners was much stricter. In Sherbert v. Verner, 83 S.Ct. 1790(1963), the Court explicitly held that strict scrutiny was the appropriate test. In that case, the state denied unemployment benefits to a woman who quit her job rather than work on her sabbath.

The Supreme Court found that the denial of benefits imposed a substantial burden on religious exercise: the woman had to choose between an income and her faith. Id. at 1795. The Court found no compelling interest and concluded that the denial of benefits violated the appellant's free exercise rights. Id. at 1796.

But free exercise law changed dramatically in 1990 when the Supreme Court decided Employment Div., Dept. of Human Resources of Oregon v. Smith, 110 S.Ct. 1595. That case involved a challange by Native Americans to a law prohibiting the use of peyote. The Court found that the law did not violate the Free Exercise Clause even though the peyote use was an integral part of a religious ceremony.

In reaching its decision the Court specifically rejected the test developed in Sherbert and held that facially neutral laws of general applicability that burden religious exercise require no special justification to satisfy First Amendment scrutiny. Smith, 110 S.Ct. at 1602-03.

Congress enacted the Religious Freedom Restoration Act (RFRA)in response to Smith. The stated purpose of the Act was to restore the compelling interest test as set forth in Sherbert v. Verner and to apply it to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. 42 U.S.C. §§ 2000bb-1, 2000bb(b)(1994).

The statute drew no distinction between claims by prisoners and claims by non-prisoners; in fact, its legislative history made clear that courts were to apply strict scrutiny to prisoners claims. See S.Rep.No. 111, 103d Cong., 1st Sess. 9(1993), expressing intent to restore "the protection accorded to prisoners to observe their religions, which was weakened by the decision in O'Lone v. Estate of Shabazz."

7

The Supreme Court struck down the RFRA in 1997. City of Boerne v. Flores, 117 S.Ct. 2157. The Court found that though Conress may inforce constitutional rights under Section 5 of the Fourteenth Amendment, the RFRA exceeded that authority by defining rights rather than enforcing them. Id at 2170.

The Religious Land Use and Institutionalized Persons Act (RLUIPA)represents Congress avoiding the constitutional problems that led to the invalidation of the RFRA. The general rule of the RLUIPA is the same as that of the RFRA − the statute provides that state action that "substantially burdens"religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. §§ 2000cc(a)(1), 2000cc-1(a).

Congress, however, narrowed the reach of this rule t to zoning ordinances and institutionalized persons. It also avoided Section 5 of the Fourteenth Amendment as the source of its authority, opting rather to use the spending power and the Commerce Clause. 42 U.S.C. §§ 2000cc-1(b)(1), 2000cc-1(b)(2).

8

RFRA case law yielded three main interpretations of the statute's substantial burden prong: the compulsion test, the centrality test, and the religious motivation test. See <u>Steven C. Seeger, Restoring Rites to Rites: The Religious Motivation Test and the Religious Freedom Restoration Act, 95 Mich.L.Rev. 1472(1997)</u>.

The Ninth Circuit used a standard that combined both centrality and compulsion. In order to show a free exercise violation using the substantial burden test, the religious adherent had the obligation to prove that a government action burdens the practice of their religion by preventing them from engaging in conduct or having a religious experience that the faith mandates. This interference must of been more than an inconvenience; it must be substantial and interfer with a tenet or belief that is central to religious doctrine. <u>Bryant v. Gomez</u>, 46 F.3d 948, 949(9th.Cir.1995).

9

The third approach, the religious motivation test, defined the substantial burden prong more broadly; religious adherents could satisfy this standard by demonstrating that the government prevented them from engaging in conduct both important to them and motivated by sincere religious belief. <u>Mack v. O'Leary</u>, 80 F.3d 1175(7th.Cir.1997), <u>Rouser v. White</u>, 944 F.Supp. 1447 (E.D. Cal. 1996).

The compulsion and centrality test have been criticized as being too restrictive and inconsistent with the broad remedial goals of the RFRA. See <u>Seeger, supra at 1499-1512</u>; <u>Daniel J. Solove, Faith Profaned: The Religious Freedom Restoration Act and Religions in the Prisons, 106 Yale L.J. 459(1996)</u>; <u>Mack</u>, 80 F.3d at 1179.

Both test exclude a wide variety of practices that are considered religious yet are not mandatory. But noncentral and noncompelled practices form a valuable part of religious experience and are important to their practitioners who would consider the denial of them a grave curtailment of their religious liberty. <u>Mack at 1179</u>.

10

The primary difficulty, however, was that neither standard can be meaningfully administered by the courts. Seeger, supra, at 1506. The test assumed that courts were capable of discerning whether a practice was central to or compelled by a claimant's religious beliefs. But courts lack the capacity to make such judgments because there is no definitive authority against which to measure a claimant's assertions regarding centrality or compulsion. Id.; Smith, 110 S.Ct. at 1604; Hernandez v. Commissioner, 109 S.Ct. 2136(1989).

Courts faced with RFRA claims often accepted the testimony members of the claimant's religion, believing that such testimony could establish centrality or compulsion. Seeger, supra, at 1507. But religion is an intensely personal experience, individuals invariably form religious views that differ from those held by members of the same faith. The right of free exercise of religion includes the right to develop views that vary from those of others. Religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection. Thomas v. Review Bd., 101 S.Ct. 1425(1981).

11

Other courts also resorted to religios text to determine centrality or compulsion but religious texts provide an improper basis for contesting the views of a claimant, given that they are often susceptible to different interpretations. Courts are not arbiters of scriptural interpretation. <u>Thomas</u>, 101 S.Ct. at 1431. No official can prescribe what shall be orthodox in religion or other matters of opinion. <u>West Virginia State Bd. of Educ. v. Barnette</u>, 63 S.Ct. 1178(1943).

The religious motivation test – which defined substantial burden as state action that prevented religious adherents from engaging in content both impotant to them and motivated by sincere religious belief – avoided many of the pitfalls of the centrality and compulsion test. The test avoided the business of deciding the place of a religious practice in the life of the claimant. <u>Seeger, supra, at 1513</u>. It only ask the courts to decide whether a practice was important to the claimant and motivated by sincere religious belief. Courts are routinely called upon to make determinations of motivation in other areas of the law. The law frequently requires proof of state of mind, thus the motivation standard allows courts to stay within the bounds of judicial capacity. <u>Rouser</u>, 944 F.Supp. at 1455.

The RLUIPA upsets the centrality and compulsion test that have been articulated in prior RFRA case law. <u>Elsinore Christian Center v. City of Lake Elsinor</u>, 270 F.Supp.2d 1163(C.D. Cal. 2003). By stating that the centrality or mandatory nature of a religious belief is immaterial to whether or not that belief constitutes religious exercise. 42 U.S.C. §§ 2000-3(g), 2000-5(7)(A).

Although the text of the RLUIPA does not specifically mention the religious motivation test, given the statutes ex-plict rejection of the centrality and compulsion test, the motivation test reflects the meaning of substantial burden under the Act - state action substantially burdens the exercise of religion when it prevents a religious adherent from engaging in conduct both important to the adherent and moyivated by sincere religious belief.

B. Argument.

1. The requirement that the plaintiff must prove or otherwise verify his Jewishness.

13

The plaintiff does not deny that no substantial burden is imposed by a requirement that a prisoner provide a writing in which he declares his religious beliefs. Resnik v. Adams, 348 F.3d 763(9th.Cir.2003). And in fact the plaintiff has reasonably complied thereto. (Exhibit B).

Here, however, the defendants have required much more than this. The plaintiff was required to obtain proof from a religious group that he is in fact Jewish. CCA Policy 20-102(Exhibit A). According to this rule, in order to recieve a religious diet or other considerations, the plaintiff must obtain verification from a faith representative and it is his responsibility to obtain this verification. This procedure is inconsistent with the First Amendment. Frazee v. Dept. of Employment Sec., 109 S.Ct. 1514(1989).

It impermissibly makes a prisoner's participation in a faith tradition contingent upon his beliefs being consistent with those professed by some recognized religious group. Frazee at 1517-18; Ford v. McGinnis, 352 F.3d 582(2d.Cir.2003).

14

It also impermissibly requires that a prisoner be recognized as a member by that groups clergy. <u>Jackson v. Mann</u>, 196 F.3d 316(2d.Cir.1999); <u>Callahan v. Woods</u>, 658 F.2d 679(9th.Cir.1981). The defendants may not rely on a clergy person's determination as to whether an inmate is a member of a faith group, entitling him to First Amendment recognition of religious practices associated with that group. <u>Jackson</u>, 196 F.3d at 320.

Nor would a clergy person's interpretation of a faith groups religious requirements be dispositive. It is an individuals understanding of the demands of his religion that is entitled to First Amendment protection. The First Amendment addresses the substantial burden on the person - not a member of a group. the protection is in force even if the plaintiff's beliefs are not held by other adherents of that religious group. <u>Thomas</u>, 101 S.Ct. at 1431. Even if it is purely personal. <u>Frazee</u>, 109 S.Ct. at 1518.

2. Supervisor Liability.

a) General.

In seeking dismissal of plaintiff's claims the defendants rely on the well established rule that supervisors are not automatically liable under §1983 for subordinates constitutional torts.

15

Defendant Rev. Mike Ensch(Ensch), however did in fact paticipate in and direct Aguirre's action in requiring the plaintiff to verify his membership in a particular religious organization. (Defendant's MSJ, pg. 9; affidavit Aguirre, Exhibit F, defendant's MSJ; Exhibit 6, defendant's MSJ).

Defendant Warden Frank Luna(Luna)does not, however, escape liability by the mere assertion that he did not participate, direct, or fail to train subordinates. The plaintiff directs the court's attention to the administrative grievance procedure in effect for Alaska contract prisoners housed at the Florence Correctional Center(FCC). AKDOC P&P 808.03. (Exhibit C).

This procedure(808.03(A)(5)), requires the warden or superintendent to be the final decision maker. Under the relevant regulations a prisoner is initially required to attempt to resolve the problem informally. If the problem is not resolved the prisoner is expected to submit a written grievance using the prescribed form. The grievance is reviewed by one of the institution's designated grievance officers who then submits written findings and recommendations to the warden.

16

After reviewing the findings the warden shall respond in writing to the prisoner's grievance. (808.03(B)(3)). The administrative regulations do not require the warden to investigate grievances personally but he is expected to moniter the process and take corrective action where appropriate. In any large organization executives delegate authority to subordinates but because of the warden's duty to review the disposition of grievances, a prison grievance is more than an ad hoc communication to an official with the power to act. Crowder v. Lash, 687 F.2d 996, 1006(7th.Cir.1982). The warden's role in the grievance process is not merely perfunctuary or formal.

The warden of a large institution is permitted to delegate authority to deal with prisoner complaints. But if the warden's subordinates fail to resolve the problem the warden cannot insulate himself from responsibility by passing the problem to that subordinate. And if the warden simply has a policy of not reading complaints from prisoners it could be considered intentional ignorance which can carry the same consequences as actual knowledge.

17

Going out of one's way to avoid unwelcome knowledge is a species of intent. Because it is sufficient for criminal liability it is sufficient for liability under the Eighth Amendment's subjective standard. McGill v. Duckworth, 944 F.2d 344, 351(7th. Cir.1991).

It is true of course that a warden cannot be expected to review subordinates' decisions based on professional expertise, issues related for example to medical treatment. Here, however, no particular professional expertise was required. Defendant Luna is equally able to evalute whether requiring written verification from a religious organization substantially burdened plaintiff's religious practice.

b) Liability under RLUIPA.

In contrast to § 1983 which provides a cause of action against any person, RLUIPA is violated when a government imposes a substantial burden on the religious exercise of a person. RLUIPA, however, defines "government" broadly, as including not only state and local governments, but also their agencies, their officials, and others acting under color of law. 42 U.S.C. § 2000cc-5(4).

The definition applies both to those capable of imposing a substantial burden, §2000cc-1; and those who may be sued for appropriate relief under § 2000cc-2. In speaking of liable parties as governments rather than persons, RLUIPA implicitly authorizes <u>respondeat superior</u> liability.

3. RLUIPA claim.

The plaintiff easily meets the criterion delinated by the defendants(defendants MSJ, pg. 14-15). It is precisely the requirement that the plaintiff verify his faith choice with an outside religious organization that cannot be applied with out constituting a burden on religious exercise. <u>Frazee</u>, 109 S.Ct. at 1517-18.; <u>Ford</u>, 352 F.3d at 589. the defendants cannot make a showing that this policy is the least restrictive means of furthering a compelling interest.

Shifting responsibility to a Jewish religious organization as a condition of religious exercise is misplaced. The plaintiff is not in the care and custody of any such organization; the plaintiff is under the legal authority of the defendants and it is their obligation to respect his free exercise of religion - not any outside group.

19

The defendants are incorrect in stating that the plaintiff must show that the Alaska Department of Corrections(hereafter AKDOC)recieves federal funding for religious programs. Defendant Aguirre is an employee of defendant Corrections Corporation of America(hereafter CCA); his salary is paid by CCA, he implements CCA policy. The Federal District Court for the District of Arizona has already held RLUIPA applicable to CCA's operation at the Florence Correctional Center(hereafter FCC). Coronel v. Paul, 316 F.Supp.2d 868(2004).

CCA recieves federal funding for housing federal detainies, the defendants have not responded to the plaintiff's discovery request on this subject but the plaintiff has personal knowledge that federal detainies are housed at FCC.

Further their is an interstate burden affecting the Commerece Clause. CCA is a private corporation that houses and transports prisoners to and from a variety of locations in many states. The plaintiff is a resident of the State of Alaska housed under contract between the AKDOC and CCA in the State of Arizona. CCA hold an Alaska business license while at the same time being a corporation based in the State of Tennessee.

20

4. First Amendment Claim.

The plaintiff does not question that the defendants have a legitimate interest in assuring that access to religious programming is based upon an inmates sincere belief. The plaintiffs are free to argue that the plaintiff lacks sincerity at trial. However, where questions regarding a litigant's state of mind, motive, sincerity or conscious are implicated, it is innapropriate that disposition be made by summary judgment. Consol Elec. Co. v. United States for Use and Benefit of Gough Indus., 355 F.2d 437, 438-39(9th.Cir.1966).

The need for full exposition of facts is profound under such circumstances since determining a man's state of mind is subjective problem, capable of resolution only by reference to panoply of factors. Patrick v. LeFevre, 745 F.2d 153, 159(2d. Cir.1984). Traditionally this function has been entrusted only to the jury. Anderson, 106 S.Ct. at 2510.

21

To obtain dismissal per _Turner_, the defendants need make more than a purely formalistic, logical connection between a regulation that effects plaintiff's constitutional rights and a penological objective. _Turner_, 107 S.Ct. at 2266. Whether a prison violates an inmates' First Amendment right of free exercise of religion is a mixed question of law and fact. _Friedman v. Arizona_, 912 F.2d 328(9th.Cir.1990).

In _Turner_ the Supreme Court held out a four factor test to determine whether a regulation reasonably relates to a legitimate penological interest. _Friedman at 331_. Those factors are:

1) Whether the regulation has a logical connection to the legitimate government interest invoked to justify it.

2) Whether alternative means of exercizing the right on which the regulation impinges remain open to prison inmates.

3) The impact that accomidation of the asserted right will have on guards, other inmates, and prison resources; and

4) The absense of ready alternatives that fully accomodate the prisoner's rights at de minimis cost to valid penological interest.

This test requires findings of law and fact that go beyond the proper scope of the summary judgment motion. It requires the weighing of factors that is properly a jury function. Warren, 58 F.3d at 441.

5. Injunctive Relief.

The argument and case citations of the defendants all relate to the issue of the preliminary injuction. The plaintiff has not requested preliminary injunction from the court.

6. State Law Claims.

a) Free Exercise of Religion.

The link that the defendants make between requiring verification of plaintiff's religious faith and a compelling governmental interest is purely formalistic.(cf. plaintiff's opposition to defendant's MSJ, pg. 22). Defendants supply no testimony or other evidence to support their statements regarding drug traffiking or other criminal activity by other Alaskan inmates incarcerated at FCC. Indeed, since there are no Jewish services at FCC, plaintiff can hardly be attempting to utilize his faith to promote contraband.

23

More to the point, however, the defendants simply cannot require the plaintiff to verify his commitment to a faith tradition with an outside religious organization. <u>Jackson</u>, 196 F.3d at 320. (cf. plaintiff's opposition to defendant's MSJ, pg. 14-15).

Further, CCA Policy 20-102 is not neutral and is therefore not subject to such analysis. This policy is specifically directed at religious practice; its effects are not incidental or unintended. <u>Smith</u>, 110 S.Ct. at 1600-1601; <u>Larson v. Cooper</u>, 90 P.3d 125, 127(Alaska 2004).

b) Rehabilitation Claim.

The defendants mistate the matter by maintaining that the plaintiff was only required to fill out a form. Due to the improper verification requirement, the plaintiff is denied all access to his faith tradition. Under Alaskan law prisoners have an enforceable interest in the participation in rehabilitation programs. <u>Ferguson v. DOC</u>, 816 P.2d 134, 139(Alaska 1991). The citation by defendants of <u>Hays v. State</u>, 830 P.2d 783(Alaska 1992) is from dicta, not holding. <u>Hays</u>, 830 P.2d at 785.

24

Incarceration by its nature denies a prisoner participation in the larger human community. To deny the opportunity to affirm membership in a spiritual community may extinguish an inmates last source of hope and dignity. Treatment that frustrates the ability to choose pursuits through which an inmate can manifest himself and gain self respect erodes the very foundation upon which he can prepare for a socially useful life.

Religion in prison serves this rehabilitative function by providing an area with in which the inmate may reclaim his dignity and reassert his individuality. Barnett v. Rodgers, 410 F.2d 995, 1012(D.C.Cir.1969). Incarcerated far from home and bereft of all normal family contact, the plaintiff maintains that the free exercise of religion is basic to his rehabilitation and reintergration back into society.

c) Third Party Beneficiary Claim.

The plaintiff's status as a third party beneficiary arises out of circumstances related to the Cleary Final Settlement (hereafter Cleary FSA). This agreement was negotiated between Alaskan prisoners and AKDOC.

25

In effect prisoners in Alaska and the AKDOC have an enforceable contractual relationship related to conditions of confinement. CCA is required to abide by the conditions of that settlement agreement. Smith v. Cleary, 24 P.3d 1245( Alaska 2001).In addition, the CCA/AKDOC contract that provides for the housing of Alaskan prisoners provides for and binds CCA to obey all laws, regulations, and court orders relating to conditions of confinement.

The Cleary FSA was clearly intended to be for the benefit of Alaskan prisoners. Since compliance with the Cleary FSA was necessary to permit transfer of Alaskan prisoners to FCC – the CCA/AKDOC contract language related to conditions of confinement are clearly intended to benefit the plaintiff. Thus establishing third party beneficiary status. Smith, 24 P.3d at 1250-51.

7. Conclusion.

For the forgoing reasons, the defendant's motion for Summary Judgment should be denied.

DONE THIS 20th, day of August, 2006 at Florence, Arizona.

_Earl Worthy III_
Earl Worthy III #268520

26

Certificate of Service

This is to certify that a true and correct copy of
plaintiff's opposition to the defendant's motion
for summary judgment and all attachments was
mailed this ___28th___ , day of August, 2006 to:

Jones, Skelton & Hochuli, P.L.C.
2901 N. Central Ave., ste 800
Phoenix, AZ. 85012
Attorney for defendants.

My New Address: Earl Worthy III #368520
CCA/Red Rock
1752 East Arica Road
Eloy, AZ 85231